**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

MARQUISA WINCE; and
MARY CANTWELL,

PLAINTIFFS,

v.            Nos. 4:20-CV-1274-BSM; 4:20-CV-1278-BSM

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas and
his official capacity as Chairman of the Arkansas
State Board of Election Commissioners; et al.,

DEFENDANTS.

**DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs' preliminary-injunction motion is a solution in search of a problem.  Arkansas law does not require election officials to stop counting ballots at 7:30 PM on Election Day.  And Plaintiffs tellingly do not even *allege* that any election official has *ever* refused to count a validly cast ballot simply because the clock struck 7:31.  Nor do Plaintiffs allege that any official has threatened to do so this year.  Instead, for no apparent reason, Plaintiffs seek to manufacture a constitutional claim based on their singular misinterpretation of Arkansas law and ask this Court to order election officials to do what they've *always done*—count every validly cast vote.

Plaintiffs have badly misinterpreted Arkansas law.  And even if they had a colorable claim, they could have brought this lawsuit months or years ago.  The provision they challenge has been on the books since 2013, and there is no evidence that it has ever caused a single ballot to go uncounted.  Yet Plaintiffs delayed bringing this suit until mere days before November 3, 2020 general election, and even after filing suit engaged in procedural shenanigans that further delayed resolution of this matter.

As a result of Plaintiffs' dilatory tactics, any injunction would sow electoral chaos and violate the Supreme Court's rule against last-minute election interventions.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam).  Indeed, this election year alone, the Supreme Court has on *nine* different occasions either stayed a lower court's last-minute injunction or refused to vacate a court of appeals' stay of such an injunction.  And that makes sense because as the Seventh Circuit earlier this month explained in summarily reversing an Indiana district court for granting last-minute election relief, the Supreme Court's cases do "not leave room for ongoing debate" on changes to election laws at this point.  *See Common Cause Indiana v. Lawson*, No. 20-2911, — F.3d —, 2020 WL 6042121, at *2 (7th Cir. Oct. 13, 2020).  That alone requires denying Plaintiffs' motion.

Plaintiffs' claims also fail for a host of other reasons.  Indeed, just to name a few, their claims aren't justiciable, are barred by the Eleventh Amendment, run afoul of the doctrine of laches, and rest on a farcical interpretation of Arkansas law.  Nor would Plaintiffs be entitled to relief even if they could make the required clear showing that they are likely to prevail on the merits because they don't allege any irreparable harm and the balance of the equities and the public interest weigh in Arkansas's favor.  The Court should deny Plaintiffs' motion for a preliminary injunction and dismiss their complaint with prejudice.

## BACKGROUND

### A.    Nature of Plaintiffs' Claims

Plaintiffs are Arkansas residents who have allegedly cast absentee ballots for the November 2020 general election.  Amd. Compl., DE 9 ¶¶ 4-5.[1]  On October 23, 2020, they filed a complaint in the Circuit Court of Pulaski County, Arkansas, claiming that Arkansas Code Annotated

---

[1] Unless otherwise indicated, all docket entries cited in this brief refer to the docket in Case No. 20-1274.

7-5-416 violates the United States Constitution and the Arkansas Constitution.  Defendants promptly removed the lawsuit to this Court.  *See* Notice of Removal, DE 1.  Because the state court reached out to Defendants regarding setting hearing, Defendants informed the state court that the case was being removed.  At this point, despite claiming no knowledge of Defendants' removal, Plaintiffs tried to file an amended complaint in state court about half-an-hour after Defendants removed, in an apparent attempt to defeat this Court's jurisdiction.  *See* Motion to Voluntarily Dismiss, DE 6 ¶ 5.  And despite this Court's indisputable jurisdiction over this lawsuit, Plaintiffs proceeded to re-file that amended complaint as a new state-court lawsuit the following business day.  *See* Notice of Removal, *Wince v. Thurston*, No. 20-1278 (E.D. Ark. Oct. 26, 2020), DE 1.

Defendants also removed that case and sought consolidation of both federal-court lawsuits.  *See* Motion to Consolidate, *Wince v. Thurston*, No. 20-1278 (E.D. Ark. Oct. 26, 2020), DE 6.  Given that both lawsuits are essentially identical, Plaintiffs have now dropped their opposition to proceeding before this Court.  *See* Withdrawal of Motion to Dismiss, DE 7.

In both lawsuits, Plaintiffs' central claim is that Arkansas law prohibits county election officials from counting any absentee ballots after "the closing of the polls on election day."  Ark. Code Ann. 7-5-416(a)(5)(A); *see* Amd. Compl. ¶ 26.  Yet that statutory language has existed since 2013.  *See* 2013 Ark. Act 1211, sec. 3, 89th General Assembly, Reg. Sess. (Apr. 12, 2013) (amending Ark. Code Ann. 7-5-416(a)(5)(A)).  And Plaintiffs have not alleged that any election official has ever shared their interpretation of Section 416(a)(5)(A).  *See* Amd. Compl. ¶¶ 20-39 (discussing at length the content of Arkansas law but setting forth no factual allegations).

What's more, although Plaintiffs attach to their complaint an affidavit from Susan Inman to support their claims, Ms. Inman nowhere attests that a ballot has ever been rejected solely

based on an arbitrary counting deadline like the one that Plaintiffs imagine Section 416 imposes. *See* Inman Affidavit, DE 9-1, Ex. A ¶¶ 6-10.  As a former member of the Pulaski County Board of Election Commissioners, Ms. Inman has "been involved in running elections in Pulaski County since 1994."  *Id.* ¶ 2.  She left that post in 2013 only because she ran for Secretary of State.  *Id.*  If Ms. Inman has no evidence of county election officials interpreting Arkansas law to create an arbitrary 7:30 PM deadline, then such evidence is unlikely to exist.  It comes as no surprise, then, that Plaintiffs' counsel told the media last week that the interpretation of Section 416 hypothesized by the complaint "has never been enforced."  Linda Satter, *Suit filed over law on ballot counting*, Ark. Democrat-Gazette (Oct. 24, 2020).[2]

Plaintiffs must admit that Section 416 "has never been enforced" according to their interpretation because all the evidence shows that no Arkansas election official has ever shared their interpretation.  Quite the opposite.  The media's coverage of Plaintiffs' lawsuit has caused confusion among election officials, who have "never understood this requirement to prohibit the processing of timely and sufficient ballots which are waiting to be counted simply because the process could not be completed prior to 7:30pm."  Ex. A, Shults Decl. (attached "Petition for a Declaratory Order").  Indeed, this confusion led the Green County Election Commission to submit a petition requesting that the State Board of Election Commissioners issue a declaratory order answering the following question: "Does Arkansas Code Annotated section 7-5-416(a)(5)(A) or section 7-5-416(d) prohibit the counting of timely and sufficient absentee ballots after the close of the polls on election day?"  *Id.*  The State Board intends to issue an order answering this question at its regularly scheduled meeting today, October 28, 2020, at 1:30 PM—shortly after this Court's preliminary-injunction hearing.  Ex. A, Shults Decl. ¶ 7.  "Once issued, that declaratory

---

[2] https://www.arkansasonline.com/news/2020/oct/24/suit-filed-over-law-on-ballot-counting/

order should put to rest any notion that county election officials must stop counting absentee ballots at 7:30 PM on election day." *Id.*

The theory of Plaintiffs' lawsuit, therefore, is that if county election officials were to adopt a novel interpretation of Section 416—an interpretation Plaintiffs' counsel *admits* no Arkansas official has ever adopted—they would then be violating the federal and state constitutions.

### B.      Arkansas's Antifraud Efforts

Plaintiffs have offered no evidence that election officials agree with their interpretation of Arkansas law.  Before explaining the legal reasons why Plaintiffs' claims and preliminary-injunction motion fail as a result of their misinterpretation, it is helpful to understand the historical background of the statutes that form the basis of their claims.

The statutes at issue in this case arose out of Arkansas's long-term goal of eliminating absentee-ballot fraud.  Arkansas has an especially egregious and well-documented history of absentee-ballot-box stuffing.  *See* Jay Barth, "Election Fraud," *CALS Encyclopedia of Arkansas* (January 25, 2018), https://encyclopediaofarkansas.net/entries/election-fraud-4477/.  The memoir of the Hon. Tom Glaze, the late Arkansas Supreme Court Justice and crusader against election fraud, recounts his discovery that election fraud is "an Arkansas tradition."  Tom Glaze, *Waiting for the Cemetery Vote: The Fight to Stop Election Fraud in Arkansas* (2011), at 6.  In fact, "Arkansas . . . is the one state where fraud was so dire and so perniciously ignored that citizens were forced to conduct their own investigations and file lawsuits to obtain an honest accounting and tabulation of the votes." *Id.* at x.

Much of this history relates to absentee ballots. *See id.* at 39 ("If you want to steal an election, the absentee box is the place to begin.").  Throughout much of the 20th century, Justice

5

Glaze's observation was borne out by rampant late-night absentee-ballot falsification.  He explains that, for example, the Conway County sheriff holed up in the courthouse on election night in 1958 to stuff the ballot box with fraudulent absentee ballots—apparently, a common practice of that era.  *Id.* at 39-40.  Corrupt officials delayed counting absentee ballots, waiting on the returns from other precincts in order to know how many ballots they would need to manufacture to bring about their preferred outcome.  Justice Glaze then recounts another story from a decade-and-a-half later, where election officials in Conway County chose "to shoot baskets and throw back a few beers" before finally starting to count ballots after midnight.  *Id.* at 125.  "It was three o'clock in the morning before the counting was done," and there was clear evidence of ballot-box stuffing.  *Id.*

Not until the closing years of the twentieth century did the General Assembly begin to enact more strict requirements for handling absentee ballots, *id.* at 210, and even that not has not rooted out absentee-ballot fraud in Arkansas.  For example, in 1999, 518 absentee ballots were invalidated in a special election for a municipal judgeship in Camden, overturning the certified results and changing the outcome.  *Id.* at 210-11.  In 2005, hundreds of fraudulent absentee ballots were discovered in a state-senate primary election.  *Id.* at 211-14.  And in 2012, four Crittenden County, Arkansas men pleaded guilty to conspiracy to bribe voters to influence absentee votes.  *See* "Four Crittenden County Men Charged with Conspiracy to Commit Election Fraud," *Archive of the United States Attorney's Office for the Eastern District of Arkansas*.[3]

The provisions that Plaintiffs challenge seek to remedy this history of absentee-ballot fraud in Arkansas by creating a uniform timeline for all counties to follow.  By requiring counties to begin counting "prior to the closing of the polls," provisions like Section 416 ensure that

---

[3] https://www.justice.gov/archive/usao/are/news/2012/September/Hallumetal_electionfraud_Infoplea_090512 .html

6

counting begins during the day rather than the middle of the night, which reduces the likelihood that ballot fraud can go undetected. Ark. Code Ann. 7-5-416(a)(5)(A). And by requiring counties to report an "initial count" to the Secretary of State "as soon as practical after the polls close on election day," such provisions ensure that counties cannot drag ballot counting on. Ark. Code Ann. 7-5-416(a)(5)(B)(i). Prompt election returns leave less time for fraudulent counting measures.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary, disfavored remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of a preliminary injunction, and they must make "a clear showing" they have carried that burden. *Id.* at 22; *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Plaintiffs are only entitled to a preliminary injunction upon showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 24-25; *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

Two aspects of this lawsuit make Plaintiffs' task here particularly difficult. First, because Plaintiffs' requested injunction would prevent "implementation of a duly enacted state statute," they must first make a "*more rigorous* showing" than usual "that [they are] 'likely to prevail on the merits.'" *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (emphasis added) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)). That requirement guards against attempts to "thwart a state's presumptively reasonable democratic processes." *Rounds*, 530 F.3d at 733. "A more rigorous standard 'reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a

7

higher degree of deference and should not be enjoined lightly.'" *Id.* at 732 (quoting *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)).  Second, Plaintiffs' burden "is a heavy one where, as here, granting the preliminary injunction will give [Plaintiffs] substantially the relief it would obtain after a trial on the merits."  *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).

Plaintiffs cannot meet their heightened burden of demonstrating they are likely to prevail on the merits in this case.

## ARGUMENT

### I.    With absentee-ballot counting beginning next week, any injunction affecting that process would only amplify the confusion Plaintiffs themselves have created.

"As an election draws closer, th[e] risk will increase" that a court order altering electoral procedures will itself disenfranchise voters by creating "voter confusion and consequent incentive to remain away from the polls."  *Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006) (per curiam). And in this case, an election is not merely close, it is already here.  Indeed, as the Eleventh Circuit explained nearly a month ago in staying a district court injunction, "we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed."  *New Ga. Project v. Raffensperger*, No. 20-13360-D, — F.3d —, 2020 WL 5877588, at *3 (11th Cir. Oct. 2, 2020).  That is because absentee voting has been underway for a month and a half, returned absentee ballots are currently being processed and canvassed, and counting begins in mere days.

There was no confusion about Section 416 until Plaintiffs brought this lawsuit and garnered media attention for their novel misinterpretation of the provision.  Any relief this Court might grant to Plaintiffs can only serve to intensify that confusion in the public mind and for county election officials seeking to understand what the law requires.  Indeed, "[e]ven seemingly

innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66, slip op. at 2 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

That is why, as recently as this week, the Supreme Court reiterated its instruction that lower federal courts not intervene at the last minute in state elections. On October 26, it denied an application to vacate the Seventh Circuit's stay of an injunction concerning Wisconsin's Election Day deadline for absentee ballots. *Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66 (U.S. Oct. 26, 2020).

Including that case, the Supreme Court this year has reiterated no less than *nine* times that federal courts should not enter orders affecting election procedures close to elections. *See Merrill v. People First of Ala.*, No. 20A67, 2020 WL 6156545 (U.S. Oct. 21, 2020) (staying an injunction of Alabama's ban on curbside voting); *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020) (staying an injunction of an absentee-ballot witness requirement); *Clarno v. People Not Politicians Or.*, No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020) (staying an injunction that had suspended signature requirement for ballot initiative petitions); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020) (same); *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020) (staying an injunction that had suspended some antifraud rules for absentee voting during the COVID-19 pandemic); *Tex. Democratic Party v. Abbott*, No. 19A1055, 140 S. Ct. 2015 (June 26, 2020) (denying application to vacate stay of injunction entered by the Fifth Circuit in suit challenging vote by mail rules during COVID-19); *Thompson v. DeWine*, No. 19A1054, 2020 WL 3456705, at *1 (U.S. June 25,

2020) (denying application to vacate stay of injunction entered by the Sixth Circuit in suit challenging signature requirement for ballot initiative petitions); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (granting stay of injunction that had extended deadline for receipt and counting of absentee ballots).

The courts of appeals have followed the Supreme Court's lead on this point. Just last week—on the same day this lawsuit was filed—the Eighth Circuit stayed an injunction that altered Missouri's absentee-voting requirements. *See Org. for Black Struggle v. Ashcroft*, No. 20-3121, — F.3d —, 2020 WL 6257167, at \*4 (8th Cir. Oct. 23, 2020). And since the first of October, at least six court-of-appeals decisions have stayed district courts' injunctions of state absentee-voting laws. *See Common Cause Indiana v. Lawson*, No. 20-2911, — F.3d —, 2020 WL 6042121 (7th Cir. Oct. 13, 2020) (on motion for stay, summarily reversing an injunction of Indiana's absentee-ballot-receipt deadline); *People First Ala. v. Sec'y of State*, No. 20-13695-B, 2020 WL 6074333 (11th Cir. Oct. 13, 2020) (staying September 30 injunction of Alabama absentee-voting laws but not of laws unrelated to absentee voting); *Tex. League of Un. Latin Am. Citizens v. Hughs*, No. 20-50867, — F.3d —, 2020 WL 6023310 (5th Cir. Oct. 12, 2020) (staying October 9 injunction requiring additional absentee-ballot drop-off locations); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, — F.3d —, 2020 WL 5951359, at \*1 (7th Cir. Oct. 8, 2020) (staying September 21 injunction of Wisconsin absentee-voting laws); *Ariz. Democratic Party v. Hobbs*, No. 20-16759, — F.3d —, 2020 WL 5903488, at \*1 (9th Cir. Oct. 6, 2020) (staying September 10 injunction of Arizona absentee-voting laws); *Raffensperger*, 2020 WL 5877588, at \*1 (on October 2, staying August 31 injunction of Georgia absentee-voting laws).

Because a mid-election order would violate the Supreme Court's clear instruction—an instruction applied over and over this election by the Court and the courts of appeals—this Court

10

should deny Plaintiffs' motion for a preliminary injunction. *See also League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2020 WL 6269598, at \*5 (W.D. Ark. Oct. 26, 2020) (holding that "mandating . . . changes by injunctive relief while absentee voting is ongoing seems likely to further disrupt county election processes during a period that has already been characterized by a host of disruptive pandemic-related changes to voting procedures, and—rightly or wrongly—to undermine confidence in the electoral process").

**II.   Plaintiffs present no justiciable controversy.**

Section 416 in its current form has been on the books since 2013. *See* 2013 Ark. Act 1211, sec. 3, 89th General Assembly, Reg. Sess. (Apr. 12, 2013) (amending Ark. Code Ann. 7-5-416(a)(5)(A)). Plaintiffs have not alleged that any election official anywhere in Arkansas has ever shared their peculiar interpretation of Section 416(a)(5)(A). *See* Amd. Compl. ¶¶ 20-39 (discussing at length the content of Arkansas law but containing no factual allegations). Thus there is no evidence—nor even any allegation—that Plaintiffs or any other voter will be injured by Plaintiffs' imagined 7:30 PM deadline. This lawsuit therefore does not present a justiciable case or controversy.

No matter whether it's framed in terms of ripeness, standing, mootness, or a lack of adversity, Plaintiffs' lawsuit fails as a matter of law. Indeed, the Supreme Court has explained that "[t]he various doctrines of 'standing,' 'ripeness,' and 'mootness,' . . . are but several manifestations . . . of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe v. Ullman*, 367 U.S. 497, 503-04 (1961) (footnotes omitted). Federal courts "have no right to pronounce an abstract opinion upon the constitutionality of a State law." *Id.* at 504 (quotation omitted).

### A.    Plaintiffs' claims are not ripe.

Plaintiffs' claims are not ripe for adjudication. "[T]he ripeness inquiry requires examination of both **[1]** the fitness of the issues for judicial decision and **[2]** the hardship to the parties of withholding court consideration." *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quotation, citation, and alteration omitted). "The fitness prong safeguards against judicial review of hypothetical or speculative disagreements." *Id.* (quotation and citation omitted). "The hardship prong asks whether delayed review inflicts significant practical harm on the plaintiffs. *Id.* (quotation and citation omitted). "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention. A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 875-76 (quotations and citations omitted).

Plaintiffs bear the burden of providing evidence to establish that their claims satisfy both the fitness and hardship prongs. Viewing the complaint in that light, their allegations do not even rise to a speculative level because they do not allege facts sufficient to show that they will suffer harm caused by any legitimate application of Section 416. There is no chance that Arkansas law will cause Pulaski County election officials (the county where Plaintiffs allegedly reside) to stop counting absentee ballots at 7:30 PM on Election Day because Section 416 does not prohibit counting after that time.

But even if the Court were to read into the complaint facts necessary to allege that absentee ballots remaining after 7:30 PM may go uncounted, their claims would still rest on purely contingent future events that "may not occur as anticipated, or indeed may not occur at all." *Id.* at 875-76. Plaintiffs have likewise articulated no reason to believe that this Court's delaying review will cause him any harm—to say nothing of the "significant practical harm" required under the second prong of the ripeness test. *Id.* at 875. Because Plaintiffs claims are not fit for judicial

12

decision and because the Court's withholding review will not cause any hardship to the parties, they are not ripe for adjudication.

### B.      Plaintiffs lack standing.

Plaintiffs likewise cannot carry their burden to show standing.  They have not alleged facts sufficient to show that they will suffer an injury caused by any legitimate application of Section 416.  In the typical case, a statute must be enforced against a plaintiff before she may challenge its constitutionality, but pre-enforcement review is available in some contexts if "threatened enforcement [is] sufficiently imminent"—that is, if there is "a credible threat" that the provision will be enforced against the plaintiff.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 160 (2014).

This case is not fit for pre-enforcement review.  Plaintiffs conjure fictional injuries caused by an imaginary refusal to count absentee ballots.  As just discussed in the context of ripeness, there is no imminent threat of an election official refusing to count a valid absentee ballot, whether submitted by Plaintiffs or other Arkansans, solely because the clock strikes 7:31. Worse still, Plaintiffs fail even to present evidence that *they have cast absentee ballots*.  The record contains no declaration or affidavit from either Marquisa Wince or Mary Cantwell, and there is not even so much as an allegation that they are registered to vote in Pulaski County or anywhere else.  To show an injury-in-fact, a plaintiff must show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006).  Plaintiffs have not carried that burden.  Therefore, their purported injury is not sufficiently imminent for Article III purposes. *See Lujan*, 504 U.S. at 564 n.2 (quotation and citation omitted) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the

13

alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.").

Second, Plaintiffs lack standing because there is no causal relationship between any conceivable injury and Section 416. To demonstrate a causal connection, a plaintiff must show that the injury is "fairly traceable" to the defendant. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). But because Section 416 does not prohibit counting absentee ballots after polls close, Plaintiffs cannot meet this element either.

And third—with no injury or causal connection—Plaintiffs have no claim that is likely to be redressed by a favorable decision. Regardless of the outcome of this lawsuit, Section 416 will not prohibit Arkansas election officials from counting absentee ballots that remain after the polls close. For any or all of these reasons, Plaintiffs lack standing.

**C.     Plaintiffs' claims are moot.**

Plaintiffs' claims are, or very shortly will be, moot. "A court properly dismisses a claim as moot if it has lost its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract questions of law." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012) (quotation and citation omitted).

In response to media coverage of Plaintiffs' lawsuit, the chair of the Green County Election Commission submitted a petition requesting that the State Board of Election Commissioners issue a declaratory order answering the following question: "Does Arkansas Code Annotated section 7-5-416(a)(5)(A) or section 7-5-416(d) prohibit the counting of timely and sufficient absentee ballots after the close of the polls on election day?" Ex. A, Shults Decl. Arkansas law empowers the State Board with authority to interpret the pre-close counting requirement, and it has never interpreted the provision as prohibiting vote counting after the polls close. *Id.* Plaintiffs and Ms. Inman are the only ones to advance a contrary notion. *Id.* It is anticipated that the

14

State Board will take up the Greene County Election Commission's petition at its regularly scheduled meeting today, October 28, 2020, and issue a declaratory order consistent with its longstanding interpretation. *Id.*

A declaratory order is issued by the State Board's authority under Arkansas Code Annotated section 25-15-203(a) and -206 and the State Board's Rules of Practice and Procedure, section 1104. *Id.* It will resolve the proper interpretation of sections 7-5-416(a)(5)(A) and -416(d) as to the Greene County Election Commission, and will serve to advise all other county election commissions of their duties under those statutory sections, as they are all similarly situated. *Id.* Plaintiffs ask for a "legally enforceable assurance that . . . election officials will not stop counting" when the polls close. DE 11 at 2. The State Board's declaratory order is precisely that, and any semblance of a controversy created by Plaintiffs' idiosyncratic interpretation of Section 416 is negated by it.

Plaintiffs could not avoid mootness by claiming that Defendants have voluntarily ceased the challenged conduct. A defendant's voluntary cessation moots a case only when that conduct cannot reasonably be expected to recur. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). Given the State Board's declaratory order, it would be proper to say that the conduct Plaintiffs challenge cannot reasonably be expected to recur—except that Arkansas election officials never enforced Section 416 according to Plaintiffs' confused interpretation to begin with. So it is improper even to speak of "cessation," and Plaintiffs' claims are, or shortly will be, moot.

**D.      This action lacks adversity.**

Finally, this action also lacks the adversity necessary to constitute it as a justiciable controversy. *Hohn v. United States*, 524 U.S. 236, 241 (1998). This case is like *Poe v. Ullman*, where Plaintiffs challenged an 1879 Connecticut statute that prohibited the use of contraceptives.

15

367 U.S. 497 (1961). The plaintiffs did not clearly allege that the state was going to take any action adverse to them but claimed only that the state's attorney regarded contraceptive use as an offense. *Id.* at 501. In fact, the state's attorney had elected *not* to prosecute anyone under the statute. *See id.* at 501-02. The Court explained that, "within the framework of our adversary system, the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." *Id.* at 503. Therefore, "any cause that is not in any real sense adversary, that does not assume the honest and actual antagonistic assertion of rights to be adjudicated" is "unfit for adjudication." *Id.* at 505. Adversity is "a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court." *Id.* (quotations and citation omitted). "These considerations press with special urgency in cases challenging legislative action or state judicial action as repugnant to the Constitution." *Id.* at 503.

This case is like *Poe* because it is not adversarial. To begin with, Plaintiffs have not alleged that any election official anywhere in Arkansas has ever shared their peculiar view that Section 416 prohibits the counting of absentee ballots after the polls close. Defendants likewise have not taken that position. "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it." *People of State of Ca. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893). Plaintiffs' claims here are not subject to the crucible of controversy that the U.S. Supreme Court has declared to be indispensable to the judicial proceedings of Article III courts. So this action does not constitute an Article III controversy.

16

**III.**   ***Pennhurst* bars Plaintiffs' state-constitutional claim.**

The United States Constitution, including the Eleventh Amendment, absolutely bars suits brought against a state or its agencies or departments, regardless of the relief sought. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The same applies to suits brought against state officials in their official capacities. *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (per curiam). Plaintiffs have sued Defendants in their official capacities only. Amd. Compl. ¶¶ 6-7.

Plaintiffs seek declaratory and injunctive relief in an attempt to invoke the *Ex parte Young* exception, which allows a narrow range of actions against public officials. 209 U.S. 123 (1908); *see Papasan v. Allain*, 478 U.S. 265, 276-77 (1986). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quotation and alteration omitted).

Here, Plaintiffs' claims under the Arkansas Constitution are barred because *Ex parte Young*'s exception is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 106. "[W]hen a plaintiff alleges that a state official has violated *state* law[,] . . . the entire basis for the doctrine . . . disappears" because its purpose is to vindicate federal rights and, in the process, ensure the supremacy of federal law. *See id.*; *see also Va. Office for Protection & Advocacy*, 563 U.S. 247, 255-56 (2011) (endorsing *Pennhurst*); *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 293 (1997) ("*Ex parte Young* gives life to the Supremacy Clause." (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985))). "[F]ederal courts are unable to order state officials to conform their conduct to state law." *Greene v. Dayton*, 806 F.3d 1146, 1150 (8th Cir. 2015). Because *Ex parte Young* does not apply to state-law

17

claims, Plaintiffs' claim under the Arkansas Constitution is barred, and it should be dismissed with prejudice. *See Minnesota Voters All. v. Walz*, No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *7 (D. Minn. Oct. 2, 2020) (slip opinion) (sovereign immunity barred claim brought under Minnesota's constitution).

## IV.     Laches bars any relief.

Plaintiffs delayed bringing this action until mere days before the November 3 election despite Section 416's existence since 2013, COVID-19's disruption of daily life since mid-March, and Plaintiffs' own allegation that "Ms. Wince and Ms. Cantwell submitted their absentee ballots *far in advance* of election day." DE 11 at 3 (emphasis added). And even after this suit was filed and removed to federal court, Plaintiffs waited *four more days* to file their motion for a preliminary injunction. *See* DE 10. Plaintiffs offer no excuse for their delay, which has prejudiced Defendants' ability to defend this lawsuit. Laches therefore bars Plaintiffs' claims. *See Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979) (holding that laches bars a claim where (1) a plaintiff inexcusably delays bringing suit, (2) resulting in prejudice to the defendant). Laches bars even constitutional claims. *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1182 (9th Cir. 1988); *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 631 (S.D.N.Y. 1989).

Make no mistake, the last-minute timing of this litigation is a result of Plaintiffs' own litigation strategy. Such delays in bringing election-related claims are inexcusable when plaintiffs wait to file their lawsuit until elections are imminent. *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990); *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Ind. Redistricting Comm'n*, 366 F. Supp. 2d 887, 907-09 (D. Ariz. 2005); *Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996). Courts have foreclosed plaintiffs from seeking injunctive relief in election-related

18

suits filed *weeks* prior to a candidate filing deadline. *Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 610 (4th Cir. 1970). Here, Election Day is six days from today, early voting has been ongoing for over a week, and absentee voting has been ongoing since September 18—more than five weeks ago. *See* Ark. Code Ann. 7-5-407(a)(2) (absentee ballots provided to voters on September 18). Plaintiffs' strategic choice to delay until mere days before Election Day to bring this lawsuit is inexcusable.

Plaintiffs' inexcusable delay unduly prejudices Defendants. The State Board is already overburdened at this time of both early voting and absentee voting, handling numerous urgent election-related issues faced by the 75 different county boards of election commissioners that administer the election in their respective counties. This lawsuit unduly distracts state and local election from their duties in the middle of an election. Undue prejudice exists where election plans were finalized well in advance of a plaintiff's suit, and counties have already conformed their precincts and readied their election machinery to implement the plan. *Ariz. Minority Coal.*, 366 F. Supp. 2d at 909. Plaintiffs' delay undoubtedly prejudices not just Defendants but also all of Arkansas's counties—not to mention Arkansas voters.

Further, Plaintiffs' inexcusable delay has unjustifiably forced Defendants to defend against their claims on an extraordinarily expedited timeline. The false urgency of this litigation has prejudiced Defendants' ability to mount its defense to Plaintiffs' request for preliminary-injunctive relief. Further, Plaintiffs' delay has left Defendants without sufficient time to locate witnesses and to cross-examine Plaintiffs' witnesses' testimony.

"Under certain circumstances, such as where an impending election is imminent and a [s]tate's election machinery is already in progress, equitable considerations . . . justify a court in

19

withholding relief." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  Injunctive relief is inappropriate in light of equitable considerations where "greater harm lies in casting doubt on and imperiling the upcoming election." *Berry v. Kander*, 191 F.Supp.3d 982, 988 (E.D. Mo. 2016) (denying candidate's request for injunction against Secretary of State's enforcement of congressional districts in upcoming election).  Because Plaintiffs' inexcusable delay has prejudiced Defendants, laches bars Plaintiffs' claims, and the Court should deny Plaintiffs' motion for a preliminary injunction.

## V.      Plaintiffs are unlikely to succeed on the merits.

Even if Plaintiffs could overcome these serious jurisdictional and procedural obstacles, their claims would still fail on the merits.  Section 416 plainly requires counting before the polls close, but it does not prohibit counting any ballots that remain afterwards.  In fact, Arkansas law unmistakably contemplates that at least some ballots will be counted after polls close.  Further, canons of statutory construction dictate that, to avoid absurdity and constitutional repugnance, timely and validly cast ballots remaining after the polls close must be counted.  Finally, even mandatory election procedures become merely directory after the polls close.  For each of these reasons, the counting of timely and validly cast absentee ballots must be completed regardless of how long that process takes.  Plaintiffs are entitled to no relief, and the Court should deny their motion for a preliminary injunction.

### A.      Section 416 does not prohibit counting after the polls close.

Plaintiffs suggest, without evidence, that Section 416 prohibits the counting of absentee ballots after the polls close at 7:30 PM on Election Day.  That suggestion is bereft of any scintilla of factual support and is entirely false.  As already noted, Plaintiffs' counsel himself has said to the media that he has no reason to believe that such counting would be prohibited on November 3.  Satter, *supra*, *Suit filed over law on ballot counting*.

Arkansas law unmistakably contemplates the counting of ballots after the close of the polls on Election Day:

- "*Upon the close of the polls*, the poll workers immediately shall certify and attest the list of voters and *continue the count to completion*." Ark. Code Ann. 7-5-603(3)(A) (emphasis added). Indeed, "[i]f a poll worker becomes sick or incapacitated from any other cause, the remaining poll workers shall *continue the count until it is completed*[.]" Ark. Code Ann. § 7-5-603(3)(B) (emphasis added).

- A first-time voter's absentee ballot that becomes provisional due to a failure to provide required identification "*shall be counted*" if the voter resolves the issue "by 12:00 noon on the Monday following the election." Ark. Code Ann. § 7-5-308(f)(2)(A).

- Absentee ballots of active military personnel executed by Election Day "*shall be counted*"—even if they are not received until the tenth day *after* the election. Ark. Code Ann. § 7-5-411(a)(1)(B)(ii) (emphasis added); *see* Ark. Code Ann. § 7-5-411(a)(1)(B)(i) (similar provision for overseas voters).

- "Absentee voting *may be accomplished*" by ballots that are mailed and received by the county clerk by "7:30 p.m. on election day." Ark. Code Ann. § 7-5-411(a)(1)(A) (emphasis added). But ballots that are *delivered to the county clerk* by 7:30 PM plainly cannot have been already *counted by election officials* by 7:30 PM. So counting those ballots after 7:30 PM is plainly necessary to ensure that voting is "accomplished." *Id.*; *see* Ark. Code Ann. § 7-5-412(c) (county clerk must "promptly" deliver any "absentee ballots received by mail on election day before the polls close . . . to the election officials designated to canvass and count absentee ballots").

Although any unfinished counting continues after the polls close at 7:30 PM, as explained above, Section 416 serves the important purpose of reducing opportunities for late-night absentee ballot-box stuffing by ensuring that counting is already underway by the time the polls close.

Under Arkansas law, "the primary rule of statutory interpretation is to give effect to the intent of the legislature." *BHC Pinnacle Pointe Hosp., LLC v. Nelson*, 2020 Ark. 70, at 16, 594 S.W.3d 62, 73 (2020). "[T]he court will look to the plain and ordinary meaning of the text," and where there is no facial ambiguity, "there is no need to resort to the canons of statutory construction." *Willis v. King*, 352 Ark. 55, 59, 98 S.W.3d 427, 429 (2003). The Court must "reconcile statutory provisions to make them consistent, harmonious, and sensible in an effort to give effect

21

to every part." *Nelson*, 2020 Ark. 70, at 16, 594 S.W.3d at 73. "Furthermore, [courts] will not read into a statute language that was not included by the legislature." *Id.*

The Arkansas General Assembly did not enact any provision stating that the counting of ballots after the close of the polls on Election Day is prohibited, and the State Board has never taken the position that timely and validly cast ballots should go uncounted. Ex. A, Shults Decl. Plaintiffs arrive at their contrary, stilted interpretation of Section 416 only by studiously refusing to read the related statutory provisions consistently and sensibly to give effect to every part. *See* Amd. Compl. ¶¶ 20-39. Indeed, Plaintiffs themselves recognize that their interpretation is *inconsistent* with those provisions of law. *See* Amd. Compl. ¶¶ 29-39 (discussing ways in which other provisions conflict with Plaintiffs' interpretation).

Section 416 provides, "Absentee and early votes shall be counted prior to the closing of the polls on election day as provided under this section." Ark. Code Ann. 7-5-416(a)(5)(A). Further, "[i]t is the intent of this section to require the election officials for absentee ballots to meet and process, canvass, and count absentee ballots according to this section prior to the closing of the polls on election day." Ark. Code Ann. 7-5-416(d).

These provisions requires counting before the polls close. It says nothing about *prohibiting* counting *after* the polls close. This case is similar to *Our Community, Our Dollars v. Bullock*, where the Arkansas Supreme Court rejected a similar attempt to read a prohibition into a time-related election provision. 2014 Ark. 457, 18-19, 452 S.W.3d 552, 563 (2014). Objectors challenged the certification of a local-option petition, arguing that a law providing ten days to cure a signature deficiency after notice of insufficiency prohibited the gathering of signatures prior to that period. *Id.* at 18, 452 S.W.3d at 563. The court held that although the law envisioned the collection of signatures after the notice of insufficiency, "there is nothing in the statute

22

that expressly prohibits a sponsor from collecting signatures" beforehand. *Id.* It reiterated that, "[i]n construing statutes, this court will not add words to a statute to convey a meaning that is not there" and "will not read into a statute a provision not put there by the General Assembly." *Id.*

Section 416 envisions the counting of absentee ballots will *begin* before the polls close, but it similarly does not prohibit counting absentee ballots afterwards. To convey that meaning, it would be necessary to insert language into the statute so that it reads, "Absentee and early votes shall be counted prior to the closing of the polls . . . [*and none shall be counted thereafter*]." Ark. Code Ann. 7-5-416(a)(5)(A). Because that italicized language is not present, and because Arkansas law unmistakably contemplates post-close counting of ballots, Section 416 does not prohibit counting after the polls close. Plaintiffs' claims hinge on a contrary interpretation of Section 416 that disregards its plain text. As a result, their claims are not likely to succeed on the merits, and the Court should deny Plaintiffs' motion for a preliminary injunction.

**B.      Canons of statutory construction rule out any inference that ballots remaining after the polls close must go uncounted.**

Interpreting Section 416 is straightforward, but even if there were some doubt, relevant canons of statutory construction would rule out any inference that ballots remaining after the polls close must go uncounted. Under both the absurdity canon and the constitutional-avoidance canon, the Court should reject Plaintiffs' singular interpretation of Section 416.

First, "an important canon of statutory construction" is that courts do "not engage in interpretations that defy common sense and produce absurd results." *Nucor Corp. v. Kilman*, 358 Ark. 107, 122, 186 S.W.3d 720, 729 (2004); *see In re Bailey*, 299 Ark. 352, 354, 771 S.W.2d 779, 781 (1989) (even ostensibly mandatory provisions are not interpreted as such when that interpretation leads to absurd results). This canon of construction has a long pedigree; as early as

1935, the Eighth Circuit was already calling it a "well-settled rule." *U.S. ex rel. Anderson v. Anderson*, 76 F.2d 375, 378 (8th Cir. 1935). According to the absurdity canon, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consist[e]nt with the legislative purpose are available." *Monahan v. Flannery*, 755 F.2d 678, 682-83 (8th Cir. 1985) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). An interpretation of Section 416 that produces the absurd result that county clerks must cease counting absentee ballots at the close of polls should be avoided because there is an alternative interpretation consistent with the legislative purpose of counting every vote cast by an absentee ballot.

Construing Section 416 to prohibit counting after the polls close would defy common sense. *See* Amd. Compl. ¶ 27 (Plaintiffs asserting that if their stilted interpretation of the pre-close counting requirement "sounds impossible, that's because it is"). According to Plaintiffs' interpretation, Section 416 both: (1) bars officials from counting any absentee ballots *before* polls close; and simultaneously (2) bars officials from counting any absentee ballots *after* polls close. *See, e.g.*, *id.* ¶ 32. According to Plaintiffs, therefore, the Arkansas General Assembly has permitted absentee voting only to also prohibit election officials from counting any absentee ballots. The Court should not adopt Plaintiffs' absurd interpretation of Section 416. It would "defy common sense" to read the provision as Plaintiffs do. *Nucor Corp.*, 358 Ark. at 122, 186 S.W.3d at 729.

Second, this Court should also reject Plaintiffs' interpretation under the canon of constitutional avoidance. It is a "cardinal canon of construction that a statute will be upheld unless clearly within constitutional inhibition, and where that question is doubtful the doubt must be resolved in favor of the constitutionality of the act." *Bollinger v. Watson*, 187 Ark. 1044, 63 S.W.2d 642, 644 (1933). "It is a bedrock rule, repeatedly affirmed and beyond debate," that

"[w]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *Hammer v. Sam's E., Inc.*, 754 F.3d 492, 508 (8th Cir. 2014) (quotations omitted); *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.885, 892-93 (8th Cir. 2013) (quoting *United States ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)). "[A statute] ought not be construed to violate the Constitution if any other possible construction remains available." *Union Pac.*, 738 at 893 (quoting *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1960)).

The most that can be said of Plaintiffs' interpretation is that they have identified some potential ambiguities in Arkansas law. It is clear that counties must begin counting absentee ballots before polls close. Insofar as Section 416 does not define when they must *stop* counting absentee ballots, it should be interpreted to allow the counting of ballots until a time that would avoid constitutional issues. *See Phelps-Roper v. Ricketts*, 867 F.3d 883, 890, 897-98, 897 n.2 (8th Cir. 2017) (where statute did not define "protest activities," the court interpreted the term to encompass plaintiff standing near a funeral, in order to avoid constitutional issues). Interpreting Section 416 to require county clerks to arbitrarily disenfranchise voters whose ballots happened to remain uncounted at 7:31 PM on Election Day would raise serious questions under the First and Fourteenth Amendments to the U.S. Constitution, and under Article 3, section 2 of the Arkansas Constitution. Therefore, any doubt must be resolved in favor of the pre-close counting requirement's constitutionality by adopting a construction that avoids that repugnant implication. In this case, that means refusing to read into Section 416 an implicit prohibition on counting ballots after polls close.

25

Relevant canons of statutory construction show that Section 416 must be construed not to prohibit the counting of votes remaining after the polls close. Therefore, it does not prohibit post-close counting, and the Court should deny Plaintiffs' motion for a preliminary injunction.

**C.    Under Arkansas law, Section 416 and other election provisions becomes merely directory after the polls close.**

Even if Plaintiffs were correct that Section 416 required that election officials "must finish" or "complete counting" when the polls close on Election Day, Amd. Compl. ¶¶ 1, 47—a requirement that is simply not to be found in the statute—that requirement would become merely directory at the closing of the polls. *See* "Directory Requirement," Black's Law Dictionary (11th ed. 2019) ("A statutory or contractual instruction to act in a way that is advisable, but not absolutely essential—in contrast to a mandatory requirement.").

"In determining whether the words of a statute shall have a mandatory or directory effect ascribed to them, the purposes of the act, the end to be accomplished, the consequences that may result from one meaning or the other, and the context are to be considered." *Phillips v. Rothrock*, 194 Ark. 945, 110 S.W.2d 26, 30 (1937). Here, Section 416 serves to reduce opportunities for late-night ballot-box stuffing by ensuring that absentee-ballot counting must begin before the polls close. As explained above, the immediate statutory context of the requirement includes several provisions that unmistakably contemplate the counting of ballots after the close of the polls. Further, as Plaintiffs' witness, Susan Inman, testifies, in her "decades of involvement with elections in Arkansas, there were always uncounted absentee ballots at 7:30 pm on election night." DE 9-1 at 3 ¶ 9. The consequence of construing Section 416 as prohibiting post-close counting and interpreting this language as mandatory would result in the objectionable result that some absentee voters are arbitrarily disenfranchised.

Fortunately, "Arkansas's well-established rule [is] that election procedures are mandatory before an election but are only directory after the election." *Alexander v. Davis*, 346 Ark. 310, 318, 58 S.W.3d 330, 336 (2001). Indeed, "election laws . . . are mandatory before the election and merely directory after the election, so that voters *will not be disfranchised by the failure of election officials to perform certain duties*." *Christenson v. Felton*, 226 Ark. 985, 989 n.5, 295 S.W.2d 361, 363 n.5 (1956) (emphasis added). In other words, the Arkansas Supreme Court has made clear Arkansas election laws will not be interpreted to create arbitrary barriers to counting validly submitted votes.

Plaintiffs' interpretation of Section 416 violates this principle. Section 416 becomes merely directory after the polls close, and the counting of timely and validly cast absentee ballots must be completed regardless of how long that process takes. Plaintiffs are unlikely to succeed on the merits. They are entitled to no relief, and the Court should deny their motion for a preliminary injunction.

## VI.    The remaining preliminary-injunction factors also warrant denial of Plaintiffs' motion.

Because Plaintiffs' claim fails on the merits they are not entitled to an injunction, and this Court need not consider the remaining injunction factors. *See Jegley*, 864 F.3d at 957-58 (holding that where an injunction would prevent "implementation of a duly enacted statute," the movant must begin with a "more rigorous showing" than usual "that [he is] 'likely to prevail on the merits'") (quoting *Rounds*, 530 F.3d at 733); *see also Rounds*, 530 F.3d at 737 n.11 (holding that the remaining injunction "factors cannot tip the balance of harms in the movant's favor when the [likelihood of success] requirement is not satisfied"). But those other factors warrant denial of Plaintiffs' motion.

27

Plaintiffs face no irreparable harm.  Arkansas election officials do not interpret Section 416 to prohibit post-close counting.  Ex. A, Shults Decl.  Plaintiffs complain about the entirely imaginary scenario where Pulaski County election officials decide to stop counting absentee ballots at the close of the polls.  But there is no evidence that Plaintiffs are registered voters—let alone that they have cast absentee ballots.  And even if they had, wholly unsubstantiated fears about what might happen in some counterfactual world where election officials shared Plaintiffs' peculiar interpretation of the law are insufficient as a basis for a preliminary injunction.  *See, e.g.*, *Regan v. Vinick & Young*, 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction."); *NACCO Material Users, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007) (same).  Further, even in the make-believe scenario where Plaintiffs' votes went uncounted due to Pulaski County election officials' unlawful refusal to count ballots after the polls closed, Plaintiffs' harm would not be irreparable because the Arkansas Constitution explicitly provides for the counting of such votes.  *See* Ark. Const. Art. 3, sec. 11 ("If the officers of any election shall unlawfully refuse or fail to receive, count, or return the vote or ballot of any qualified elector, such vote or ballot shall nevertheless be counted upon the trial of any contests arising out of said election.").

Plaintiffs also bear the burden of proving that "the balance of equities so favors [them] that justice requires the court to intervene." *Dataphase Sys.*, 640 F.2d at 113.  But Plaintiffs cannot hope to meet this burden.  First, the equities do not favor Plaintiffs so that justice requires the Court to intervene.  No injunction is necessary or appropriate for the Court to construe the law as Arkansas officials have always interpreted it: as simply requiring officials to begin counting before the polls close.  Further, Arkansas "indisputably has a compelling interest in preserving the

integrity of its election process." *Purcell*, 549 U.S. at 4 (citation omitted). This requirement reduces opportunities for late-night ballot box stuffing. An injunction would inflict irreparable harm on the State and be manifestly contrary to the public interest by removing or weakening this antifraud protection. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (holding that, by definition, a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *accord Ashcroft*, 2020 WL 6257167, at *4.

This harm to Arkansas and to its citizens is exacerbated by Plaintiffs' inexcusable delay in bringing this lawsuit. They might have sued months or even years ago. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam). So Plaintiffs' dilatory litigation tactics alone would require denying injunctive relief. *See Little*, 2020 WL 4360897, at *2 (Roberts, C.J., concurring in grant of stay) (granting stay where initiative would be precluded from appearing on the November ballot where the delay was "attributable at least in part" to the plaintiff, which "delayed unnecessarily" in pursuing relief) (internal quotations omitted); *McGehee v. Hutchinson*, 854 F.3d 488, 491 (8th Cir. 2017) (en banc) (holding that in matters of equity, delay on the part of the moving party creates "a strong equitable presumption against the grant" of relief).

The public interest is best served by denying Plaintiffs' motion rather than by entering an injunction with the potential to amplify confusion created by Plaintiffs' novel and wrongheaded notions. Further, the Supreme Court has made clear that the public interest is not served by courts entering injunctions affecting election procedures shortly before elections. *See Purcell*, 549 U.S. at 4-6. When a federal court is asked to enter an injunction even "weeks before an election," the court must "weigh, in addition to the harms attendant upon issuance or nonissuance of

29

an injunction, *considerations specific to election cases*." *Id.* at 4 (emphasis added). Those election-case considerations include the danger that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5; *see Brakebill v. Jaeger*, 905 F.3d 553, 559-60 (8th Cir. 2018) (granting stay of injunction), *application to vacate stay denied*, 139 S. Ct. 10; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). The State has an interest in "the stability of its political system," *Storer*, 415 U.S. at 736, and "in avoiding confusion, deception, and even frustration of the democratic process at the general election," *Jenness*, 403 U.S. at 442; *see Mays v. Thurston*, No. 4:20-CV-341 JM, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020) (explaining that a "last-minute restructuring of the state-absentee voting law[] would add further confusion and uncertainty and impair the public's strong interest in the integrity of the electoral process").

That is why the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see Andino*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring in grant of application for stay); *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020). So the equitable injunction factors also lead this Court to deny the preliminary-injunction motion.

### CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

LESLIE RUTLEDGE
 Arkansas Attorney General

30

VINCENT M. WAGNER (2019071)
  Deputy Solicitor General

MICHAEL A. CANTRELL (2012287)
  Assistant Solicitor General

MICHAEL A. MOSLEY (2002099)
  Assistant Attorney General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-8090
(501) 682-7395
vincent.wagner@arkansasag.gov

*Attorneys for Defendants*

31